IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMY M. AHNERT, M.D. | : CIVIL ACTION |
| | : |
| v. | : NO. 24-2561 |
| | : |
| LEHIGH VALLEY HEALTH NETWORK | : |

**MEMORANDUM**

SCHMEHL, J. - *JLS*                                                      APRIL 24, 2025

       Plaintiff, a former cardiologist for Defendant Lehigh Valley Health Network ("LVHN") brought this action against LVHN, asserting claims for gender discrimination in compensation under the Lilly Ledbetter Fair Pay Act (Count One), gender discrimination based on disparate treatment under Title VII (Count Two), hostile work environment under Title VII (Count Three), retaliation under Title VII (Count Four) and constructive discharge under Title VII (Count Five). LVHN filed a motion to dismiss the entire Complaint. The Court heard oral argument on the motion. The Court denied the motion to dismiss without prejudice and directed the Plaintiff to file an Amended Complaint attempting to rectify, within the strictures of Rule 11, the defects to the original Complaint raised by defense counsel during the oral argument. [ECF 23.] Plaintiff subsequently filed an Amended Complaint. Presently before the Court is LVHN's Rule 12(b)(6) motion to dismiss Counts Three through Five of the Amended Complaint as well as to strike certain discrete acts that occurred prior to May 12, 2023 as time-barred. For the reasons that follow, the motion is granted in part and denied in part.

1

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a claim. In reviewing a motion to dismiss, the court accepts as true a complaint's factual allegations and views them in the light most favorable to the plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d. Cir. 2008). Although a complaint need not contain detailed factual allegations to survive a motion to dismiss, it cannot rest on mere labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, "a formulaic recitation of the elements of a cause of action will not do." *Id.* Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and be "sufficient to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than the sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

The Amended Complaint alleges that Plaintiff began working with LVHN in 2006, initially as a hospitalist and then as part of a Fellowship program until 2010. Am. Compl. at ¶ 8. She alleges that during that time, the program director, Dr. Larry Jacobs, treated her "disparately and less favorably than male doctors and tempted to blackball her from obtaining a position as an attending physician at Defendant LVHN." *Id*. Specifically, Plaintiff alleges that Dr. Jacobs criticized her about her child-care responsibilities and that he was not receptive to accommodating her schedule to attend to those responsibilities. *Id*. at ¶ 9.

In 2010, LVHN offered Plaintiff a position as a Clinical Cardiologist. *Id*. at ¶11. Plaintiff accepted the offer and became the only woman in the group. *Id*. Plaintiff

alleges that during her first year as a Clinical Cardiologist, she was paid $50,000 less than the amount set forth in LVHN's standard compensation plan and was told she "needed to 'prove herself' first." *Id.* at ¶12.

According to Plaintiff, LVHN engaged in "unequal and discriminatory pay practices" throughout her tenure at LVHN. *Id*. at ¶14. She claims she was paid "substantially less than her comparable male counterparts" despite taking on "additional responsibilities and producing at a higher level than others." *Id*. at ¶ 18. Plaintiff alleges that she was a "top performer" at LVHN and received numerous achievements and distinctions. Id. at ¶15. She claims her "performance and productivity were superior to her male counterparts." *Id*. at ¶ 26. Plaintiff alleges that LVHN "wrongfully reduced various substantial benefits" that it provided to her, including supplemental retirement benefits, supplemental life benefits and supplemental disability benefits. *Id*. at ¶¶ 19, 20.

Plaintiff alleges that in 2014, LVHN "changed its compensation plans for cardiologists from a salary/bonus program to a Relative Value Unit ("RVU") target plan." *Id*. at ¶ 22. "Under this new practice, [Plaintiff] earned significantly less pay than her comparable male counterparts even though her productivity was equal to or greater than those male comparators." *Id*. at ¶ 23. The male counterparts included Dr. Nauman Islam, M.D., Dr. Matthew Martinez, M.D. and Dr. Matthew Schumaecker, M.D. *Id*. at ¶ 24. Plaintiff alleges that she "was also denied additional administrative time, a form of compensatory time, despite the fact that she brought in significant revenue and was consistently recognized for her contributions." *Id*. at ¶ 25.

In December 2019, Plaintiff applied for the position of Chief of Cardiology at LVHN. Id. at ¶ 27. She alleges that she was the "best qualified candidate." *Id*. at ¶ 29.

Although she became one of two finalists for the position, she claims, based on information and belief, she was not selected because of her gender. *Id*. at ¶ 31. According to Plaintiff, based on information and belief, she was not selected because male doctors such as Dr. Babak Bozorgnia "told management that they did not want to work for a woman." *Id*. at ¶ 32. She claims, based on information and belief, that LVHN left the position vacant while it searched for a male to fill the position. *Id*. At no time did LVHN provide Plaintiff with any feedback regarding the promotion or provide any reason for leaving the position vacant. *Id*. at ¶ 34.

Plaintiff alleges that in early 2020, when Covid struck, she served as the "*de facto* Chief of Cardiology" at LVHN without receiving any additional compensation, title change or additional administrative time. *Id*. at ¶¶ 36-37. Nevertheless, LVHN continued to advise that it would not fill the position of Chief of Cardiology. *Id*. at ¶ 39.

In the Spring of 2021, Plaintiff expressed her concern to "management" about being underpaid and overlooked for promotion. *Id*. at ¶ 40. In her annual performance evaluation for the period from July 1, 2020 to June 30, 2021, Plaintiff "received a 'Top Performer,' the highest rating." *Id*. at ¶ 41.

In July 2021, Plaintiff accepted the position of "Practice Leader," a position she alleges was not a promotion since she did not receive any additional compensation or benefits. *Id*. at ¶ 42. Plaintiff alleges, based on information and belief, that the previous Practice Leader, Dr. Andrew Sumner, earned "significantly more" in administrative time than Plaintiff. *Id*. at ¶ 43.

In early 2022, Plaintiff met with Dr. Ronald Freudenberger, Physician in Chief for LVHN, regarding her alleged unfair compensation. During the meeting, she

4

"conveyed the clear message" that she was "underpaid and unfairly treated because she was a woman." *Id*. at ¶ 49. According to Plaintiff, Dr. Freudenberger "replied [with] words to the effect that, 'he agreed, he hears her and he will try to fix it and rectify it this year.'" *Id*. at ¶ 50.

During her meeting with Dr. Freundenberger, Plaintiff also learned for the first time that she was "getting paid less for administrative time" and was therefore "earning less as a result of the increased administrative time associated with her *de facto* Chief of Cardiology role." *Id*. at ¶¶ 51-52.

"A couple of months later, in response to [Plaintiff's] continued complaints of unfair pay, Dr. Freudenberger repeated similar comments and promised to address the pay inequities but again, failed to take any immediate measures to remedy such issues." *Id*. at ¶ 53. Plaintiff alleges that at one point Dr. Freudenberger told Plaintiff, in a disrespectful tone, "if you don't want to be a Practice Leader, you don't have to." *Id.* at ¶ 54.

Plaintiff alleges that as Practice Leader she was second-in-command to Dr. Freudenberger, but that when he went on vacation, she was not selected to run the monthly practice meeting, as was the historical procedure, and a male doctor was chosen instead. *Id*. at ¶¶ 55-57.

According to the Amended Complaint, "[i]n April 2022, without any prior notice, [Plaintiff] returned from vacation, walked into her office and saw that all of her personal belongings had been removed, placed in a box and taken to another office – all to make room for Dr. Eric Elgin, the new Chief of Cardiology." *Id*. at ¶ 60. Plaintiff claims she was "as or better qualified than Dr. Elgin." *Id*. at ¶ 61. Plaintiff claims that despite her

5

office having been cleared out in April 2022, Dr. Elgin did not actually start at LVHN until June 2022. *Id*. at ¶ 65. She also claims that "around this time" her compensation was reduced. *Id*. at ¶ 66. Dr. Freudenberger rejected Plaintiff's attempts to speak with him and told her she could express her concerns to Dr. Elgin once he started as the new Chief of Cardiology. *Id*. at ¶ 67. Plaintiff alleges that she assisted Dr. Elgin into his role as Chief of Cardiology, "while she kept overseeing the clinical cardiology group, practice operations and budgets, etc." *Id*. at ¶ 69.

In February 2023, Plaintiff met with Dr. Elgin and "detailed her history of mistreatment and being significantly and consistently undervalued and underpaid" because she was a woman. *Id*. at ¶ 72. She requested a new title, "Chief of Clinical Cardiology," fair compensation, and a new compensation model. *Id*. at ¶ 73. According to Plaintiff, Dr. Elgin was "sympathetic" and told Plaintiff he would speak with Dr. Freudenberger and "'get back to her very soon.'" *Id*. at ¶ 76.

Plaintiff alleges that "[t]wo weeks later, however, Dr. Elgin advised that [LVHN] was making an "organizational change" and that [Plaintiff] was being removed from her leadership position and being replaced by a male, Dr. Ben Sanchez." *Id*. at ¶ 77. Plaintiff alleges that she was "substantially more qualified" than Dr. Sanchez. *Id*. at ¶ 78. Plaintiff claims that Dr. Elgin acted in concert with others at LVHN to retaliate against Plaintiff. *Id*. at ¶ 79. LVHN also gave Dr. Sanchez the Chief of Clinical Cardiology title that Plaintiff had been requesting. *Id*. at ¶ 80. Plaintiff also alleges, based on information and belief, that Dr. Sanchez earned more administrative time pay than Plaintiff when he was assigned to the Chief of Clinical Cardiology position. *Id*. at ¶ 45.

In the summer of 2023, Plaintiff again raised her complaints of pay discrepancy and lack of promotion with Dr. Freudenberger who refused to meet with her to discuss her "on-going" issues. *Id*. at ¶ 81.

Plaintiff alleges that in July 2023, she "was advised that she, along with others, were getting their Paid Time Off ("PTO") reduced and that [LVHN] required a new employment agreement." *Id*. at ¶ 82. Plaintiff alleges that on August 15, 2023, she "signed a new employment agreement with one week less of PTO and an agreed upon salary." *Id*. at 83. She further alleges that in her September 21, 2023 paycheck, she noted, "a decrease in her compensation which violated her employment agreement." *Id*. at ¶ 84. Plaintiff alleges that the next day she received a new compensation letter that was dated August 16, 2023 which contained a lower compensation than what she had agreed to on August 15, 2023. *Id*. at ¶ 85. She alleges, based on information and belief, that she was the only doctor who received a retroactive pay decrease. *Id*. at ¶ 88.

Plaintiff alleges that she was invited by one of LVHN's Board of Directors, John Malloy, to a "LVHN Heart and Vascular Institute reception at the Saucon Valley Country Club on September 7, 2023, a prominent community event." *Id*. at ¶ 89. Plaintiff alleges that on the morning of the event, however, she was disinvited via text message by LVHN's Senior Vice President and Chief Philanthropy Officer. *Id*. at ¶ 90. Plaintiff considered this action to be "hostile and retaliatory." *Id*. at ¶ 91. At the urging of Mr. Malloy, Plaintiff received a "hollow and disingenuous apology" by email from Dr. Freudenberger and LVHN's CEO, Dr. Brain Nester. *Id*. at ¶ 94.

At around this same time, Plaintiff met with Dr. Rossi, the Executive Vice President and Chief Clinical Officer at LVHN to complain about gender discrimination

7

based on her "unfair pay and promotion issues." *Id*. at ¶ 95.  During the meeting, Dr. Rossi admitted that he had "received a copy of an unsigned letter in or around February, 2023 from [Plaintiff's] team complaining about a meeting that Dr. Freudenberger and Dr. Elgin scheduled while [Plaintiff] was on paid time off and without her knowledge or participation." *Id*. at ¶ 97.  According to Plaintiff, Dr. Rossi admitted that he failed to properly address this letter and its allegations. *Id*. at ¶ 98. During the meeting, Dr. Rossi "recognized that [Plaintiff] was mistreated." *Id.* at ¶ 99. Plaintiff alleges that Dr. Rossi appeared to be "genuinely upset" about Plaintiff's predicament, but explained that "'there is a process.'" *Id*. at ¶¶100-101. Dr. Rossi subsequently made a "hollow statement to the effect that if there anything he could do to make [Plaintiff] stay at Defendant LVHN, but made no attempt to meaningfully address her discrimination complaints or mistreatment." *Id*. at ¶103. Plaintiff responded that she did not see any future for herself at LVHN under the leadership of Dr. Freudenberger and Dr. Elgin and that she did not feel "safe or comfortable" because of their failure to fix her complaints. *Id*. at ¶104. Dr. Rossi told Plaintiff that her treatment "was similar to [LVHN's] discrimination against Dr. Robert Ray, a former resident." *Id*. at ¶105. Because it "became clear to [Plaintiff] that her career path had hit a dead-end, that management was actively discriminatory and retaliating against her, and that her complaints were being disregarded," Plaintiff submitted her resignation. *Id*. at ¶¶106-107. Plaintiff received her last paycheck on January 25, 2024. *Id*. at ¶109. Plaintiff filed a Charge of Discrimination with the EEOC on March 7, 2024.

"To bring suit under Title VII, a claimant in a deferral state, such as Pennsylvania, must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d

8

Cir. 2013) (citing 42 U.S.C. § 2000e-5(e)(1)). "[D]iscrete discriminatory actions are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002). Examples of discrete acts include "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, [and] wrongful accusation." *O'Connor v. City of Newark,* 440 F.3d 125, 127 (3d Cir. 2006).

LVHN points out that Plaintiff filed her Charge of Discrimination with the EEOC on March 7, 2024. 300 days before March 7, 2024 is May 12, 2023. Thus, LVNH argues, and the Court agrees, that for purposes of Title VII, any discrete acts of gender discrimination, hostile work environment or retaliation that occurred prior to May 12, 2023 are barred by the 300-day statute of limitations.

Plaintiff does not argue that the 300-day statute of limitations does not apply to the facts of this case or that the cut-off date is a date other than May 12, 2023. Rather, Plaintiff argues that her claims of gender discrimination that occurred before May 12, 2023 still may be considered timely under the doctrine of equitable tolling.

Equitable tolling is "a remedy, however, available only sparingly and in extraordinary situations." *Koller v. Abington Mem'l Hosp.*, 728 Fed. App'x 136, 139 (3d Cir. 2018) (internal citation and quotations omitted). Our Court of Appeals has enunciated three such extraordinary situations where equitable tolling may apply: "(1) where the defendant has actively misled plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; and (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir. 1994).

Plaintiff argues that only the first situation applies here. She argues that she was continually misled and lulled into believing by Drs. Freudenberger and Elgin that they would rectify her complaints of gender discrimination based on pay inequality and failure to promote and therefore she in good faith refrained from promptly vindicating her rights by filing a Charge with the EEOC. The Court does not agree.

With regard to the first extraordinary situation, the underpinning of the doctrine of equitable tolling is that it would be "'manifestly unjust'" to permit a defendant to "benefit from [a] statute of limitations defense after intentionally misleading the plaintiff with regard to the cause of action, thereby causing the plaintiff's tardiness." *Id*. at 1389 (quoting *Miklavic v. USAir Inc.*, 21 F.3d 551, 557 (3d Cir. 1994)). Any misleading acts do not have to be egregious for equitable tolling to apply. *See, e.g. Miller v. Beneficial Management Corp.*, 977 F. 2d 834, 845 (3d Cir. 1992). (Defendant's repeated assurances to Plaintiff that her compensation was on a par with a co-worker's and that she deserved and would receive a promotion to Vice President enough to preclude summary judgment on statute of limitations grounds based on equitable tolling.)

According to the Amended Complaint, in early 2022, Plaintiff met with Dr. Freudenberger, regarding her claim of unfair compensation. During the meeting, she "conveyed the clear message" that she was "underpaid and unfairly treated because she was a woman." *Id*. at ¶ 49. According to Plaintiff, Dr. Freudenberger "replied words to the effect that, 'he agreed, he hears her and he will try to fix it and rectify it **this year**.'" *Id*. at ¶ 50. (emphasis added.) "A couple of months later," Dr. Freudenberger again promised Plaintiff he would address the "pay inequities" but again failed "to take any immediate measures to remedy such issues." *Id*. at 53 Therefore, despite Dr. Freudenberger's

comments to Plaintiff that he would try to rectify Plaintiff's alleged pay discrepancy in 2022, Plaintiff clearly knew that by the end of 2022, Dr. Freudenberger was not going to rectify the alleged pay inequities and unfair treatment she believed she was experiencing because she was a woman. She also knew by April of 2022 that LVHN was now going to fill the vacant position of Chief of Cardiology with Dr. Elgin, a male. Plaintiff also alleges that she knew around April 2022 that her compensation was reduced. Nevertheless, she did not file a Charge of Discrimination with the EEOC.

Then, in February 2023, Plaintiff met with Dr. Elgin and "detailed her history of mistreatment and being significantly and consistently undervalued and underpaid" because she was a woman. *Id*. at ¶ 72. Plaintiff requested a new title (Chief of Clinical Cardiology), fair compensation and a new compensation model. According to Plaintiff, Dr.Elgin was "sympathetic" and told Plaintiff he would speak with Dr. Freudenberger and "'get back to her very soon.'" *Id*. at ¶ 76. Yet, the Amended Complaint alleges that just two weeks later "Dr. Elgin advised that Defendant LVHN was making an 'organizational change' and that [Plaintiff] was being removed from her leadership position and being replaced by a male, Dr. Ben Sanchez." *Id.* at 77 LVHN further gave the title of Chief of Clinical Cardiology to Dr. Sanchez. *Id*. at 80. Thus, by the end of February 2023 or early March 2023, Plaintiff clearly knew that not only was she not going to become the Chief of Clinical Cardiology for LVHN as she desired, but that she was being removed from her leadership position and being replaced by a male. Again, she did not file a Charge of Discrimination with the EEOC. Since Plaintiff was aware as early as the end of 2022 that she her claims for pay inequality based on gender were not going to be addressed despite Dr. Freudenberger's comments to the contrary and certainly was aware by the end of

11

February/early March 2023 that she not only was not going to be promoted to Chief of Clinical Cardiology by Dr. Elgin but was in fact was going to be removed from her leadership position at LVHN, the doctrine of equitable tolling is not applicable. Therefore, any claims of gender discrimination based on discrete acts of pay inequality, reduction in pay and lack of promotion that occurred before May 12, 2023 are time-barred.

In her hostile work environment claim, Plaintiff alleges that the hostile work environment consisted of "unequal pay, being passed over for certain positions and/or promotions, and being excluded from certain opportunities and events, all based on her gender." *Id*. at ¶ 129. LVHN again argues that most of Plaintiff's hostile acts took place before May 12, 2023 and are therefore barred by the 300-day limitations period. Plaintiff responds that the alleged hostile acts that occurred prior to May 12, 2023 can still be part of her hostile work environment claim based on the continuing violation theory.

In *Morgan,* 536 U.S. at 113, the Supreme Court "established a bright-line distinction between discrete acts which are individually actionable, and acts which are not individually actionable but may be aggregated to make out a hostile work environment claim." *O'Connor v. City of Newark*, 440 F. 3d 125, 127 (3d Cir. 2006). Events constituting a hostile workplace environment may occur at any time "so long as they are linked in a pattern of actions which continues into the applicable limitations period. *Id*. (*citing Morgan,* 556 U.S. at 105) ("Consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period."). In contrast, discrete events that are individually actionable "must be raised within the applicable limitations

period or they will not support a lawsuit. *Id.* (*citing Morgan,* 556 U.S. at 113) ("Discrete discriminatory acts are not actionable if time barred, even if they are related to acts alleged in timely filed charges. Each discriminatory act starts a new clock for filing charges alleging that act."). As noted above, a non-exhaustive list of discrete acts includes "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, [and] wrongful accusation." *Id*. at 127.

In order for the continuing violation theory to apply, Plaintiff must show that at least one hostile act occurred within the 300-day limitation period. Plaintiff has done so by alleging the following: 1) she was disinvited from the "LVHN Heart and Vascular Institute reception at the Saucon Valley Country Club on September 7, 2023," *id.* at ¶¶ 89-91; 2) Dr. Rossi admitted to Plaintiff at a meeting in September 2023 that he failed to properly address the unsigned letter from February 2023 that informed him of a meeting that Dr. Freudenberger and Dr. Elgin had while Plaintiff was on paid time off and without her knowledge or participation, *id*. at ¶ 97-98; and 3) she was the only doctor targeted for a retroactive pay decrease *id*. at ¶ 88.

The alleged acts of Dr. Freudenberger in failing to promote Plaintiff and resolve her claim of pay inequity in 2022 and the act of Dr. Elgin in failing to promote Plaintiff and removing her from her leadership position in February 2023 as well as Plaintiff's reduction in compensation around April 2022 qualify as discrete acts under *Morgan* which are individually actionable and therefore cannot be aggregated as part of Plaintiff's hostile environment claim. However, the Court does find that Dr. Freudenberger's alleged comment to Plaintiff that "if you don't want to be a Practice Leader, you don't have to," Plaintiff being passed over to run the monthly practice meeting

13

while Dr. Freudenberger was on vacation, Dr. Freudenberger's failure to meet with Plaintiff in 2022 and in 2023 to discuss her claims of pay inequity, the clearing out of Plaintiff's office while she was on leave are not discrete acts and, although having occurred before May 12, 2023, will be allowed to be aggregated with Plaintiff's timely hostile work environment claims under the continuing violation theory.

Having delineated the acts which can comprise Plaintiff's hostile work environment claim, the Court now turns to whether the totality of these actions satisfy the requirements for a hostile work environment claim. In general, to be successful in a hostile environment action, a plaintiff must demonstrate that the workplace is "permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993), quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 67 (1986).

To succeed on a hostile work environment claim, Plaintiff must establish that: (1) she suffered intentional discrimination because of her protected status; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) there is respondeat superior liability. *Minarsky v. Susquehanna Cty.*, 895 F.3d 303, 310 (3d Cir. 2018) (quoting *Mandel v. M & Q Packaging Corp.,* 706 F.3d 157, 167 (3d Cir. 2013)).

LVHN does not argue that Plaintiff has not met the first element. However, LVHN argues that Plaintiff cannot satisfy the second element. The Court agrees.

14

To determine whether the discrimination was severe or pervasive, "a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mandel,* 706 F. 3d at 168 quoting *Harris.,* 510 U.S. at 23.  The "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id*. quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82 (1998)). Our Court of Appeals has made clear that "a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Abramson v. William Paterson Coll. of NJ,* 260 F.3d 265, 276 (3d Cir.2001) (quotations omitted).

Plaintiff does not allege that she was ever physically threatened, inappropriately touched, or propositioned for sex in any manner by anyone employed by LVHN.  While the incidents of Dr. Freudenberger making his "if you don't want to be a Practice Leader, you don't have to" comment, his failure to meet with Plaintiff in February 2023, Plaintiff being passed over to run the monthly practice meeting while Dr. Freudenberger was on vacation, her office being cleared out while she was on paid leave so that Dr. Elgin could move in and being disinvited from the LVHN Heart and Vascular Institute reception at the Saucon Valley Country Club on September 7, 2023 may have been humiliating to her, the Court finds, as a matter of law, that these incidents when viewed collectively are not indicative of any severe or pervasive conduct.  Moreover, the

allegations that Plaintiff was denied promotions and equal pay does not so much suggest the type of "severe or pervasive" discriminatory conduct that would create an abusive or hostile work environment as opposed to discrete acts constituting discriminatory treatment which can be rectified as part of a disparate treatment claim. *See Marriott v. Audiovox Corp.*, 2006 WL 3805145, at *15 (W.D. Pa. Dec. 22, 2006) ("inequity in pay and defendant's ignoring her complaints with respect to the pay inequity are not a sufficient basis for a court to conclude that there was an objectively hostile work environment.") In addition, Plaintiff herself alleges that her work performance did not suffer as the result of any alleged hostile actions by LVHN and that she "continued to perform in an exceptional manner." Am. Compl. at ¶ 68. Therefore, the Court finds that Plaintiff has failed to allege a claim for hostile work environment as a matter of law.

Plaintiff also asserts a claim against LVHN for retaliation under Title VII. To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F. 3d 331, 340-41 (3d Cir. 2006). In the retaliation context, an adverse employment action is one that would dissuade a reasonable employee from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006).

Plaintiff alleges, in general fashion, that she "engaged in protected activity when she repeatedly complained and objected to Defendant LVHN's discriminatory acts

and practices," Am. Compl. at 134, and that LVHN "retaliated against [her] and sought to dissuade her from pursuing her complaints and objections." *Id*. at 135.

LVHN does not challenge that Plaintiff engaged in protected activity, but contends that Plaintiff has not alleged an adverse employment action. Once again, the Court notes that any alleged acts of retaliation by LVHN that occurred before May 12, 2023 are barred by the 300-day limitations period. The Amended Complaint alleges only two acts of retaliation that occurred after May 12, 2023. First, Plaintiff alleges Plaintiff also alleges that she was disinvited to the LVHN Heart and Vascular Institute reception at the Saucon Valley Country Club on September 7, 2023 by LVHN's Senior Vice President and Chief Philanthropy Officer. *Id*. at ¶ 90. The Court finds that being disinvited from a prestigious company event could dissuade a reasonable employee from making or supporting a charge of discrimination.

Plaintiff alleges that on August 15, 2023, she "signed a new employment agreement with one week less of PTO and an agreed upon salary." *Id*. at ¶ 83. She further alleges that in her September 21, 2023 paycheck, she noted, "a decrease in her compensation which violated her employment agreement." *Id*. at ¶ 84. Plaintiff alleges that the next day she received a new compensation letter that was dated August 16, 2023 which contained a lower compensation than what she had agreed to on August 15, 2023. *Id*. at ¶ 85. The Court finds that the act of reducing Plaintiff's compensation on August 16, 2023 after she signed a new employment agreement on August 15, 2023 could constitute an adverse employment action since such an action could indeed dissuade a reasonable person from making a charge of discrimination. Whether there is a causal connection

17

between this adverse action and Plaintiff's protected activity can be fleshed out in discovery.

In her constructive discharge claim, Plaintiff alleges that she was "subjected to intolerable working conditions, including being marginalized at Defendant LVHN and being subject to discriminatory treatment with respect to economic opportunities and expectations." *Id*. at ¶ 142.

To establish constructive discharge, a plaintiff must show "both a hostile work environment and that 'the abusive working environment became so intolerable that ... resignation qualified as a fitting response.'" *Lewis v. University of Pennsylvania*, 779 Fed. App'x 920, 922 (3d Cir. 2019) quoting *Penn. State Police v. Suders*, 542 U.S. 129, 133–34 (2004). Factors tending to show constructive discharge include: "(1) threat of discharge; (2) suggesting or encouraging resignation; (3) a demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alterations of job responsibilities; and (6) unsatisfactory job evaluations." *Lebofsky v. City of Philadelphia*, 394 F. App'x 935, 939 (3d Cir. 2010).

Our Court of Appeals has held, however, that "[t]o prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Spencer v. Wal–Mart Stores, Inc.,* 469 F.3d 311, 317 n. 4 (3d Cir.2006). Since the Court has already determined that Plaintiff has failed to allege a level of severity and pervasiveness to make out a claim for a hostile work environment, it follows that Plaintiff cannot establish a claim for constructive discharge.